## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| SHAWN MCBREAIRTY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 1:22-cv-00206-NT |
| | ) | |
| SCHOOL BOARD OF RSU22 et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Before me is Plaintiff Shawn McBreairty's motion (ECF No. 4) for a temporary restraining order to enjoin the Defendants, the RSU 22 School Board and its chair, Heath Miller, from banning Mr. McBreairty from entering RSU 22 school property until December 31, 2022. Mr. McBreairty is seeking the temporary restraining order on an emergency basis because he wants to be permitted to attend an upcoming school board meeting on July 20, 2022.[1] For the reasons outlined below, the Plaintiff's motion for a temporary restraining order is **GRANTED**.

## BACKGROUND

Shawn McBreairty resides in Hampden, a town within Regional School Unit 22 ("**RSU 22**"). Compl. ¶¶ 1, 3. RSU 22 is governed by a school board ("**School Board**"), which is chaired by Defendant Heath Miller. Compl. ¶¶ 2–3. RSU 22 has enacted School Board-related policies, as permitted under Maine law, including a

---

[1] The Plaintiff filed his motion *ex parte* but served a copy on counsel for the Defendants, and I set an expedited briefing schedule to allow the Defendants an opportunity to file a response.

policy identified as "BEDH" and titled "Public Participation in Board Meetings" (the "**Policy**").[2] Emergency Ex-Parte Mot. for a TRO and Prelim. Inj. ("**Mot.**") Ex. A (ECF No. 4-2). In the Policy, the School Board "recognizes its responsibility to conduct the business of the district" and states that "the primary purpose of [school board] meeting[s] is for the Board to conduct its business as charged by the law." Policy 1. Pursuant to the Policy, "[t]he public is invited to attend Board meetings and will be given limited time to voice opinions or problems." Policy 1. People who speak at a school board meeting are subject to several rules under the Policy, including:

- "Speakers may be asked to keep their comments to three minutes."

- "No complaints or allegations will be allowed at Board meetings concerning any person employed by the school system or against particular students. Personnel matters or complaints concerning student or staff issues will not be considered in a public meeting . . . ."

- "Gossip, defamatory comments, or abusive or vulgar language will not be permitted."

- "All speakers must observe rules of common etiquette."

Policy 1–2. A speaker who violates the Policy's rules "may be required to leave in order to permit the orderly consideration of the matters for which the meeting was called." Policy 1. The Chair of the School Board "has the authority to stop any

---

[2] The relevant Maine law states: "A school board shall provide the opportunity for the public to comment on school and education matters at a school board meeting. Nothing in this subsection restricts the school board from establishing reasonable standards for the public comment period, including time limits and conduct standards." 20-A M.R.S. § 1001(20).

presentation that violates these guidelines or the privacy rights of others" and "may interrupt or terminate an individual's statement when it is too lengthy, personally directed, abusive, obscene, or irrelevant." Policy 2. The Chair is also tasked with "rul[ing] on such matters as the time to be allowed for public discussion, the appropriateness of the subject being presented and the suitability of the time for such a presentation." Policy 1. The Chair may ask anyone who disrupts a School Board meeting to leave and "may request law enforcement assistance as necessary to restore order." Policy 1.

Mr. McBrearty spoke at the School Board meeting on October 20, 2021. Compl. ¶ 6. Mr. McBrearty discussed an RSU 22 teacher's reading list and the availability of certain books in RSU 22 school libraries, and he read a passage from one book— *The Bluest Eye* by Toni Morrison—that was on the shelves of the high school library. Compl. ¶¶ 6–10; Compl. Ex. A (ECF No. 1-1).[3] It appears from the video of this meeting that Mr. McBrearty ran over his allotted three minutes of speaking time but was permitted by the Chair to continue speaking and wrap up his comments. Compl. Ex. A.

---

[3]    The School Board points out that the video exhibits submitted by the Plaintiff "are edited and interspersed with commentary from Plaintiff that is not part of any School Board proceeding." Defs.' Opp'n to Emergency Ex-Parte Mot. for a TRO and Prelim. Inj. ("**Opp'n**") 2 n.1 (ECF No. 13). I agree that the Plaintiff's video editing and commentary are irrelevant, and they do not factor into my analysis. I have viewed both the Plaintiff's exhibits and the official videos of the proceedings at issue on the RSU 22 School Board's website. *See Scott v. Harris*, 550 U.S. 372, 381 (2007) (noting that courts should "view[ ] the facts in the light depicted by the videotape"). For ease of reference, however, I cite to the corresponding exhibits in the record.

        The full video of the October 2021 meeting is available on the RSU 22 School Board's YouTube channel at https://www.youtube.com/watch?v=o4wZh_HXoPs.

Mr. McBreairty then spoke at the School Board's November 2021 meeting. Compl. ¶ 12. In his public comment, he raised concerns about the academic readiness of RSU 22 students, and he recounted an earlier private meeting he had attended with the Chair and several RSU 22 administrators about various concerns he had about school practices. Compl. ¶¶ 12–13; Compl. Ex. B (ECF No. 3).[4] He also discussed the School Board's failure to respond to a follow-up email he had sent them and referred to phone calls he had had with the Chair and another School Board member about his concerns. Compl. Ex. B. He ran over his speaking time, and the Chair asked him to finish up his statement. Compl. Ex. B. Mr. McBreairty concluded by requesting that the Chair (Defendant Miller) resign. Compl. Ex. B. On the video, as Mr. McBreairty continues to speak, several voices can be heard telling him that he is out of time and out of order, and Mr. McBreairty, after continuing to speak more loudly for several seconds, sits down. Compl. Ex. B.

At the School Board meeting on December 15, 2021, Mr. McBreairty again spoke during the public comment period. Compl. ¶ 16. At this meeting, Mr. McBreairty again voiced his concerns about several school-related issues, including the books in the RSU 22 school libraries, and urged parents to unenroll their children from the district's schools. Compl. ¶ 16; Compl. Ex. C (ECF No. 3-1).[5] He told the School Board that he would be submitting a list of books that he believed would be

---

[4]     The full video of the November 2021 meeting is available on the RSU 22 School Board's YouTube channel at https://www.youtube.com/watch?v=HEnCrjWJlW4.

[5]     The full video of the December 2021 meeting is available on the RSU 22 School Board's YouTube channel at https://www.youtube.com/watch?v=4HA7hIt3ghw.

appropriate for school-aged children, and he then began reading from one of the books. Compl. ¶¶ 16–17; Compl. Ex. C. At that point, the Chair asked to interrupt Mr. McBreairty for a second and stated that reading from a book was an activity and that the time was set aside for public comment. Compl. Ex. C. Mr. McBreairty continued reading over some objections, and the Chair warned him that if he continued reading, he would be asked to sit down. Compl. Ex. C. Mr. McBreairty kept reading, and the Chair asked him to sit down and informed him that his public comment period was over. Compl. Ex. C. Mr. McBreairty then went back to his seat, announcing the title of the book he had been reading from as he went. He had spoken at the podium for approximately two minutes and twenty seconds before he took his seat. Compl. Ex. C.

Mr. McBreairty spoke at the School Board's meeting on January 19, 2022, and again raised concerns he had about RSU 22's administration and what was being taught in its schools. Compl. ¶¶ 18–19; Compl. Ex. D (ECF No. 3-2).[6] Towards the end of his comment period, he addressed members in the audience, thanked them for calling him a "toxic force" because it had given him the idea for the t-shirt he was wearing, and announced that he may start selling those shirts. Compl. Ex. D.

At the School Board meeting on March 16, 2022, Mr. McBreairty spoke during the public comment period. Compl. ¶ 23; Compl. Ex. G (ECF No. 3-5).[7] Again, Mr.

[6]    The full video of the January 2022 meeting is available on the RSU 22 School Board's YouTube channel at https://www.youtube.com/watch?v=sXUG-cdDXrs.

[7]    The full video of the March 2022 meeting is available on the RSU 22 School Board's YouTube channel at https://www.youtube.com/watch?v=GLAPbCtVuY4.

McBreairty voiced his grievances about the School Board and its Chair and his ongoing concerns about a school reading list, including expressing displeasure with the teacher who had created the list. Compl. Ex. G. During his comments, Mr. McBreairty was warned by the Chair several times not to talk about specific school staff members. Compl. Ex. G. Mr. McBreairty countered that a local resident had said he was going to rape Mr. McBreairty's wife because of his comments to the School Board.[8] Compl. Ex. G. The Chair interrupted to say that he was "going down the line of gossip" and told Mr. McBreairty to "either finish up within our policy or have a seat." Compl. Ex. G. Mr. McBreairty continued speaking for the remainder of his three minutes, and, during the final seconds the Chair told him to sit down as he was out of time and was again making comments concerning specific RSU 22 personnel. Compl. Ex. G.

On April 8, 2022, counsel for RSU 22 sent Mr. McBreairty a letter and a copy of RSU 22's Policy, reminding him that he was expected to follow the Policy during the public comment period of School Board meetings. Compl. ¶ 25; Compl. Ex. H (the "**Warning Letter**") (ECF No. 3-6). The letter warned Mr. McBreairty that failing to comply with the Policy and the Chair's requests at meetings would result in the School Board taking appropriate action. Warning Letter.

---

[8]   I question whether there really was a threat to rape Mr. McBreairty's wife. In his Reply, Mr. McBreairty attached a screenshot of a contentious Facebook Messenger exchange that went as follows:
    Mr. McBreairty: Ok, I'll live rent free in your empty head. Have a great night!
    Joe Beth: How original. I'll remember it when I'm fucking your cow wife.
Reply, Ex. A (ECF No. 16-2). This seems more like juvenile social media trash talk than a credible threat.

Mr. McBreairty attended the next School Board meeting held on April 27, 2022. Compl. ¶ 37; Compl. Ex. M (ECF No. 3-11).[9] He again voiced concerns about a school book list and referred to a phone conversation he had had with the Chair about the complained-of books. Compl. Ex. M. Mr. McBreairty began playing a recording of that conversation, and the Chair interrupted to tell him that playing a recording was not permitted under the Policy. Compl. Ex. M. Mr. McBreairty disagreed and continued to play the recording. Compl. Ex. M. In the recording, Mr. McBreairty can be heard asking the Chair about the "hardcore anal sex" books on the book list. Compl. ¶ 37; Compl. Ex. M. At that point in the School Board meeting, the Chair told him: "This is vulgarity; it is not part of our policy. I'm going to ask you to shut the video off and sit down please." Compl. Ex. M. Mr. McBreairty did not comply, and the Chair repeatedly requested that he sit down. Compl. Ex. M. He then told Mr. McBreairty that if he did not sit down, he would be asked to leave the premises. Compl. Ex. M. Mr. McBreairty did not sit down, and the Chair then took a recess and asked Mr. McBreairty to leave, which he did. Compl. ¶ 37; Compl. Ex. M. Mr. McBreairty started playing the recording approximately two minutes and ten seconds into his public comment time; the Chair recessed the meeting about forty-five seconds later; and it appears that the meeting resumed (after Mr. McBreairty presumably had left the premises) approximately a minute and ten seconds after that. Compl. Ex. M.

---

[9]     The full video of the April 2022 meeting is available on the RSU 22 School Board's YouTube channel at https://www.youtube.com/watch?v=1CDYj6acP54.

Following that meeting, on May 4, 2022, counsel for RSU 22 sent Mr. McBreairty's attorney a letter, informing him that Mr. McBreairty was "temporarily prohibited from entering RSU 22 property for purpose[s] of attending any RSU 22 school-related meeting or function," whether in person or electronically via audio or video, until December 31, 2022. Compl. Ex. N (the "**Penalty Letter**") 1 (ECF No. 3-12). The letter states that the reason for the eight-month ban was Mr. McBreairty's "repeated and deliberate failure to comply with reasonable School Board policies" and his behavior at the April meeting.  Penalty Letter 1. The Penalty Letter characterizes Mr. McBreairty's actions at the April meeting to include "play[ing] an audio of a phone conversation which contained patently obscene and vulgar language," refusing to stop and sit down when the Chair "exercised his discretion" and asked him to do so, refusing to leave the premises when asked, and when he did eventually leave, holding "the audio recording behind his head and let[ting] it play loudly so that it could be heard by those attending the meeting." Penalty Letter 1. The letter states that the ban on Mr. McBreairty "is not based on any viewpoint expressed" but instead "on his use of truly obscene speech and his willful violation of School Board policies over an extended period of time." Penalty Letter 2. The letter does not provide Mr. McBreairty any information about appealing the School Board's temporary ban.

Mr. McBreairty then tried to attend the June 2022 School Board meeting, but when he arrived at the meeting the Hampden Police Department issued him a criminal trespass notice that ordered that he was forbidden to enter all RSU 22 buildings and grounds. Compl. ¶ 46; Compl. Ex. O (ECF No. 3-13). Three weeks later,

the Hampden Police Department issued a second criminal trespass notice that stated: "Mr. McBreairty is prohibited from entering RSU 22 property for the purpose of attending any RSU 22 school-related meeting or function in person, or participating in any RSU 22 school-related meeting or function held electronically via video or audio." Compl. Ex. P (ECF No. 3-14). This second criminal trespass notice was issued "to correct the overly broad prohibition" in the June notice so that the ban "aligned with the language used in the" Penalty Letter. Decl. of Nicholas Raymond in Supp. of Defs.' Opp'n ¶ 7 (ECF No. 13-1); *see* Decl. of Regan Nickels in Supp. of Defs.' Opp'n ¶¶ 9–14 (ECF No. 13-3).

On July 8, 2022, Mr. McBreairty filed his Complaint in this Court, along with his emergency motion for a temporary restraining order and preliminary injunction. The Complaint alleges that the School Board's temporary ban violates Mr. McBreairty's First Amendment rights to free speech and to petition the government under the U.S. and Maine Constitutions. Compl. ¶¶ 48–58. The Complaint also contains substantive and procedural due process claims and equal protection claims under both the federal and state constitution. Compl. ¶¶ 59–82. The School Board filed an expedited opposition to Mr. McBreairty's motion for a temporary restraining order on July 15, 2022. Defs.' Opp'n to Emergency Ex-Parte Mot. for a TRO and Prelim. Inj. ("**Opp'n**") (ECF No. 13). Mr. McBreairty filed a reply on July 17, 2022. Reply in Supp. of Mot. ("**Reply**") (ECF No. 16). Mr. McBreairty has expressed that he would like to attend the next School Board meeting, which is scheduled for July 20, 2022. Mot. 1 n.1, 20.

## LEGAL STANDARD

"Injunctive relief 'is an extraordinary and drastic remedy that is never awarded as of right.'" *Monga v. Nat'l Endowment for the Arts*, 323 F. Supp. 3d 75, 82 (D. Me. 2018) (quoting *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8–9 (1st Cir. 2012)). In deciding whether to issue a temporary restraining order, courts apply the same four-factor analysis that is used to evaluate a motion for a preliminary injunction. *Id.* For a court to grant injunctive relief, the court must evaluate:

> (1) whether the plaintiff is likely to succeed on the merits, (2) whether he is likely to suffer irreparable harm in the absence of immediate relief, (3) the balance of equities, and (4) whether granting the injunction is in the public interest.

*Norris on behalf of A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 22 (1st Cir. 2020). "In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam). At this stage, the "court need not conclusively determine the merits of the movant's claim; it is enough for the court simply to evaluate the likelihood . . . that the movant ultimately will prevail on the merits." *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020).

## DISCUSSION

### I.   Plaintiff's Likelihood of Success

Mr. McBreairty alleges several constitutional violations relating to the School Board's eight-month ban, but I address his First Amendment free speech claim first.

Although, as the movant, the Plaintiff bears the burden of establishing that a temporary restraining order should issue, the School Board shoulders much of the burden when it comes to the merits of the Plaintiff's First Amendment claim. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 509 (1969) ("In order for the State . . . to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.").

## A.     As-Applied Free Speech Claim

First Amendment claims proceed in a three-step analysis. First, I must determine whether the Plaintiff's activity "is speech protected by the First Amendment." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). If it is, I next "must identify the nature of the forum" in which the speech occurred "because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Id.* Finally, I "must assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Id.*

### 1.     Protected Speech

As to the first step in the analysis, I find that Mr. McBreairty's expression of his school-related concerns at the podium during the public comment period of School Board meetings constitutes speech that is protected under the First Amendment. *See*

*City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp. Rels. Comm'n*, 429 U.S. 167, 174–75 (1976) (holding that the First Amendment protects the rights of speakers at school board meetings that were opened for direct citizen involvement and permitted public participation).

In its Opposition, the School Board argues that the audio played by Mr. McBreairty contained obscenity. As noted above, Mr. McBreairty can be heard in the audio recording complaining about a book that he said contained "hardcore anal sex." "[O]bscene material is not protected by the First Amendment." *Miller v. California*, 413 U.S. 15, 36 (1973). Under *Miller,* courts determining whether speech or material is obscene and thus unprotected by the First Amendment must analyze three factors: "(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest" (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Id.* at 24 (quoting *Kois v. Wisconsin*, 408 U.S. 229, 230 (1972) (per curiam)). Neither of the parties develops an argument as to why Mr. McBreairty's speech either is or is not obscene. But it appears that Mr. McBreairty's comments to the School Board, though they reference sexual conduct, are not appealing to any prurient interest and are offered to make a political or philosophical point. As such, I fail to see how they can be considered obscenity under *Miller*. I therefore conclude that Mr. McBreairty's

comments were protected speech and move on to consider what sort of forum RSU 22's School Board meetings are.

## 2.   Forum Analysis

The parties disagree on forum classification. The School Board suggests in a footnote that the School Board meetings fall in the nonpublic forum category, but then "assume[s] for purposes of argument" that they are a limited public forum. Opp'n 8–9 n.2. Mr. McBreairty also vacillates between two forum categories, providing the standard for a limited public forum while urging that the School Board meeting "is more properly considered to be a full public forum." Mot. 10.

Courts have recognized four different forum types for First Amendment purposes.[10] At one end of the spectrum is the traditional public forum, such as streets or parks, which historically "have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983) (internal quotation marks omitted). In a public forum, any content-based restriction on speech receives strict

---

[10]   There is some confusion in this evolving area of law, and the categories and corresponding standards have not remained static across the cases. *Compare Minn. Voters All. V. Mansky*, 138 S. Ct. 1876, 1885 (2018) (recognizing three types as traditional public forum, designated public forum, and nonpublic forum) *with Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 679 n.11 (2010) (recognizing the three types as traditional public forum, designated public forum, and limited public forum). *See* Erwin Chemerinsky, *Constitutional Law: Principles & Policies* 1231–54 (6th ed. 2019). The First Circuit also has noted some "confusion" among the terms because "[t]he phrase 'limited public forum' has been used in different ways"—sometimes "as a synonym for 'designated public forum' " and sometimes "as a synonym for 'nonpublic forum.' " *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 76 n.4 (1st Cir. 2004) (citing cases). The *Ridley* Court "adopt[ed] the usage equating limited public forum with non-public forum and [did] not discuss the issue further." *Id.*; *see also Curnin v. Town of Egremont*, 510 F.3d 24, 28 (1st Cir. 2007) ("This circuit has used the phrase 'limited public forums' to describe non-public forums,  and we adhere to that usage here." (internal citation omitted)).

scrutiny, but "[t]he state may . . . enforce regulations of the time, place, and manner" in these forums,[11] so long as the regulations are "content-neutral, are narrowly-tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.*

A designated public forum "consists of public property which the state has opened for use by the public as a place for expressive activity," such as a meeting space in a state-run university. *Id.* The government is not obligated to make the forum open to the public, but once it does, "[t]he same standards apply" as in a traditional public forum. *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018). "Reasonable time, place and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." *Perry*, 460 U.S. at 46.

The third recognized category—the limited public forum—is similar to a designated public forum, but the opened public property is "limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Christian Legal Soc'y*

---

[11]          Thus, "[r]easonable restrictions as to the time, place, and manner of speech in public fora are permissible," and courts reviewing such restrictions apply intermediate scrutiny. *Bl(a)ck Tea Soc'y v. City of Bos.*, 378 F.3d 8, 12 (1st Cir. 2004) (citing *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989)). The Supreme Court has explained that "[t]he nature of a place, the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable." *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972) (internal quotation marks omitted). For example:

> [T]wo parades cannot march on the same street simultaneously, and government may allow only one. A demonstration or parade on a large street during rush hour might put an intolerable burden on the essential flow of traffic, and for that reason could be prohibited. If overamplified loudspeakers assault the citizenry, government may turn them down. . . . Although a silent vigil may not unduly interfere with a public library, making a speech in the reading room almost certainly would. That same speech should be perfectly appropriate in a park.

*Id.* at 116–17 (internal citations omitted). "The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Id.* at 117.

*Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 679 n.11 (2010) (internal quotation marks omitted).  In limited public forums, the state may restrict expression so long as the restriction (a) does "not discriminate against speech on the basis of viewpoint" and (b) is "reasonable in light of the purpose served by the forum." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001) (internal quotation marks omitted); *see Perry*, 460 U.S. at 46 ("In addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.").

Finally, there is the nonpublic forum, which consists of government-owned property that is not traditionally (or by designation) open for public communication. Like the limited public forum, in nonpublic forums the government can restrict speech as long as the restrictions are "reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46; *see also Mansky*, 138 S. Ct. at 1885 ("The government may reserve such a forum 'for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.' " (quoting *Perry*, 460 U.S. at 46)).

Neither the First Circuit nor the Supreme Court has yet addressed how school board meetings should be classified,[12] but most courts that have considered the issue

---

[12]    As noted above, in *City of Madison, Joint School District No. 8 v. Wisconsin Employment Relations Commission*, the Supreme Court did recognize the public's right to speak at school board

have found that they fall in the limited public forum category.[13] I agree with these assessments and find that the public comment period of the RSU 22 School Board meetings are likely a limited public forum.

The Plaintiff argues that the scrutiny applied to public fora should apply because the School Board's printed rules "permit anything at all to be discussed during the speaker's three minutes" and "do not even limit comment to school business." Mot. 10. But that is not really the case. Maine law dictates: "A school board

---

meetings "when the board sits in public meetings to conduct public business and hear the views of citizens." 429 U.S. 167, 174–76 (1976). But *City of Madison* predates *Perry* and the "sliding scale of public property categories" it introduced, so the *City of Madison* Court did not perform the forum analysis that has since been used in these speech cases. *See Scroggins v. City of Topeka*, 2 F. Supp. 2d 1362, 1370 n.4 (D. Kan. 1998).

[13]       *See Prestopnik v. Whelan*, 83 F. App'x 363, 364–65 (2d Cir. 2003) (summary order) (noting in case where former teacher was prohibited by school board policy from speaking through counsel about her tenure issue at a school board meeting that the "First Amendment generally permits the government to exclude a topic from discussion in such a limited public forum" so long as the "exclusion is viewpoint neutral and reasonable"); *Barna v. Bd. of Sch. Dirs. of the Panther Valley Sch. Dist.*, 877 F.3d 136, 142 (3d Cir. 2017) ("[W]e have twice upheld the temporary removal of a disruptive participant from a limited public forum like a school board meeting."); *Davison v. Rose*, 19 F.4th 626, 635 (4th Cir. 2021) ("All parties agree that the school board meetings were limited public fora."); *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 759 (5th Cir. 2010) ("The Board meeting here— and the comment session in particular—is a limited public forum for the limited time and topic of the meeting. Plainly, public bodies may confine their meetings to specified subject matter and may hold nonpublic sessions to transact business, and the Board meeting here fits the hornbook definition of a limited—not designated—public forum, in which the State is not required to and does not allow persons to engage in every type of speech. The Board policies exclude from public discourse certain topics of speech—including individualized personnel matters—which the Board channels into more effective dispute resolution arenas, before it hears the matter and resolves it." (internal footnotes and quotation marks omitted)); *Lowery v. Jefferson Cnty. Bd. of Educ.*, 586 F.3d 427, 432 (6th Cir. 2009) ("While this type of meeting offers citizens a chance to express their views to the board, it cannot accommodate the sort of uninhibited, unstructured speech that characterizes a public park. That is why courts call this sort of forum a 'designated' and 'limited' public forum: 'designated' because the government has intentionally opened it for public discourse, and 'limited' because the State is not required to allow persons to engage in every type of speech in the forum." (internal citations and quotation marks omitted)); *Green v. Nocciero*, 676 F.3d 748, 753 (8th Cir. 2012) ("For First Amendment purposes, the School Board meeting was what has variously been called a nonpublic or a limited public forum."); *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1225 (11th Cir. 2017) ("[T]he public-comment portions of the Board meetings and planning sessions fall into the category of limited public fora because the Board limits discussion to certain topics and employs a system of selective access.").

shall provide the opportunity for the public to comment *on school and education matters* at a school board meeting. Nothing in this subsection restricts the school board from establishing reasonable standards for the public comment period, including time limits and conduct standards." 20-A M.R.S. § 1001(20) (emphasis added). And in the Policy, the School Board "recognizes its responsibility to conduct the business of the district," states that the "primary purpose of the meeting is for the Board to conduct its business as charged by the law," allows the public limited time "to voice opinions or problems," and gives the Chair discretion to limit "irrelevant" speech. Policy 1–2. Taken together, the law and the Policy show that the School Board opened up a limited public forum for the purpose of inviting public comment on school-related matters.

### 3.    Applying the Limited Public Forum Standard

As noted above, in a limited public forum, government "[c]ontrol over access to [the] forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806. In other words:

> Once it has opened a limited forum, . . . the State must respect the lawful boundaries it has itself set. The State may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum, nor may it discriminate against speech on the basis of its viewpoint.

*Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995) (internal citations and quotation marks omitted).

Viewpoint discrimination is treated differently from content discrimination in a limited public forum. Although "content discrimination . . . may be permissible if it

preserves the purposes of [the] limited forum," viewpoint discrimination "is presumed impermissible when directed against speech otherwise within the forum's limitations." *Id.* at 830. "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* at 829–31 (finding that a school engaged in impermissible viewpoint discrimination where "[t]he prohibited perspective, not the general subject matter" resulted in the school's denial of funding to a school newspaper with a Christian viewpoint because "the subjects discussed were otherwise within the approved category of publications").

Here, Mr. McBreairty's speech falls easily within the content restrictions of the School Board meeting. At every meeting in the record before me, he constrained his comments to concerns he had with various RSU 22 matters, like the purported teaching of critical race theory, issues with reading lists and books in the school libraries, the handling of complaints by the School Board and RSU 22 administrators, and other school governance issues. Therefore, the School Board's attempts to limit Mr. McBreairty's otherwise permissible speech only pass constitutional muster if the restrictions are reasonable and viewpoint neutral.

### a.   The Past Violations Outlined in the Warning Letter

I begin by analyzing the limitations that the School Board placed on Mr. McBreairty's speech prior to the Warning Letter that the School Board sent to Mr. McBreairty on April 8, 2022. That letter states that "on a number of occasions" Mr. McBreairty was "in violation of these standards." I see only two questionable violations in the videotaped meetings up to that point.

First, in the December 2021 meeting, Mr. McBreairty spoke about books that he thought were inappropriate for the school library. He then began to read from a book that he believed was "wholesome" and should be in the library. He continued reading for a short time after the Chair warned him that reading from a book was an activity not permitted by the Policy and that he would be asked to sit down if he continued. When the Chair told him that his public comment period was over early because of this purported violation, Mr. McBreairty sat down as instructed. Nowhere in the Policy does it say that reading a book is not allowed. While Mr. McBreairty's behavior might be perceived as insolent or cheeky, he is not in violation of the written policy. Mr. McBreairty's dramatic reading appears to have been an attempt to make a point. As such, while it may be characterized as an activity, it is also expression that would likely be protected by the First Amendment. See *Casey v. City of Newport*, 308 F.3d 106, 110 (1st Cir. 2002) ("Expression need not include words to qualify for First Amendment protection. The Supreme Court has said that 'a narrow, succinctly articulable message is not a condition of constitutional protection . . . .' ") (quoting *Hurley v. Irish–Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.,* 515 U.S. 557, 569 (1995))).

Second, at the March 2022 meeting, the Chair warned Mr. McBreairty several times about not making allegations against school employees or engaging in gossip, and he told Mr. McBreairty to stay within the Policy or sit down. But Mr. McBreairty was permitted to finish his three minutes of speaking time. The reference to "gossip" comes after Mr. McBreairty's claim that a local resident had threatened to rape

McBreairty's wife because of his comments before the School Board. It seems odd to characterize a purported threat of this sort, which he claimed was related to his advocacy on school-related issues, as "gossip." The references to school personnel, however, do seem to violate the written Policy.[14]

Although the School Board may be referring to other violations such as exceeding time limits by a few seconds, criticizing the Chair, or otherwise showing attitude, the two episodes outlined above are the only two times that the Chair prohibited Mr. McBreairty from continuing to speak. Although the Warning Letter might be perceived as a restriction on speech because of the chilling effect it could have on some speakers, Mr. McBreairty does not allege that this letter violated his First Amendment rights, and he appears to have been undeterred.

### b.    The April 27th Meeting

At the School Board meeting on April 27, 2022, Mr. McBreairty returned to the topic of inappropriate books. He began playing his recorded phone conversation with the Chair about a certain book, and the School Board told him the Policy prohibited the playing of recordings. The Policy contains no such prohibition. And, like reading a book, playing a recording can be a form of protected communication. *Cf. Casey*, 308

---

[14]    With respect to the Policy, I note that a district court in Pennsylvania found unconstitutional viewpoint discrimination in a school board's application of a policy that permitted "positive and complimentary personally-directed comments supportive of Board and school employees" to be expressed at meetings but prohibited "negative, challenging, or critical personally-directed comments." *See Marshall v. Amuso*, CIVIL ACTION No. 21-4336, 2021 WL 5359020, at *5 (E.D. Pa. Nov. 17, 2021). Regardless of whether the *Marshall* court's legal analysis is correct, at this point, I lack sufficient evidence to determine whether the School Board here applies its Policy—which expressly prohibits discussion of personnel matters or "complaints or allegations" against school employees and students— has been applied in a similar fashion here.

F.3d at 110 ("[I]t is not just [the plaintiff]'s verbal expression, but also the musical sound she and her band produce, that is protected under the First Amendment.").

The Chair then told Mr. McBreairty to sit down because the language in the recording violated the Policy because it was vulgar. But, as Mr. McBreairty points out, he was trying to make his point that books containing graphic descriptions of anal sex are not appropriate for middle schoolers, and if he had read the actual passage that he was referring to it would have been far more shocking than to state that the book contained "hardcore anal sex."[15] Reply at 4. Further, some vulgar speech is protected by the First Amendment. *See Cohen v. California*, 403 U.S. 15, 25 (1971) ("Surely the State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us.").[16]

Later, in the Penalty Letter and now in the briefing before me, the School Board takes the position that Mr. McBreairty used obscene language. As discussed above, however, neither party engages with the *Miller* test for obscenity, and I conclude (in the absence of adequate briefing on the point) that Mr. McBreairty's

---

[15]    Ironically, if the Chair had permitted Mr. McBreairty to continue playing the audio recording, the audience at the School Board meeting would have heard the Chair's well-reasoned defense of RSU 22's decision to make the book in question available to students.

[16]    I note that "First Amendment jurisprudence has acknowledged limitations on the otherwise absolute interest of the speaker in reaching an unlimited audience where the speech is sexually explicit and the audience may include children." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986). That may be the case here, where it appears there were children present for at least some of the School Board meeting prior to Mr. McBreairty's comments or maybe watching the live stream at home. But the record is not sufficiently developed for me to reach that conclusion, and the School Board has not provided any grounds for me to find its restriction here was justified by the School Board's "interest in protecting minors from exposure to vulgar and offensive spoken language." *Id.*

description of a book apparently available in the library as containing "hardcore anal sex" is not in itself obscene.

The School Board's briefing also references the disrespect exhibited by Mr. McBreairty in showing off his "Toxic Force" t-shirt, arguing with the Chair about the Policy, and being critical of the Chair. I take the point that reasonable restrictions that allow the School Board Chair to keep order are permissible.[17] But establishing reasonableness is only half the battle. In order for the School Board "to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker,* 393 U.S. at 509.

The evolving, ad hoc, and unsupported[18] reasons offered by the School Board for its restrictions on Mr. McBreairty's speech suggest pretext, and they raise the specter of viewpoint discrimination. The School Board points to the fact that another woman was able to express viewpoints similar to Mr. McBreairty's without issue and that therefore this could not be viewpoint discrimination. But "allowing a viewpoint to be offered on some occasions without interruption does not prove the policy viewpoint neutral." *See Marshall v. Amuso*, CIVIL ACTION No. 21-4336, 2021 WL 5359020, at *5 (E.D. Pa. Nov. 17, 2021). Here, it is hard to shake the sense that the

---

[17] I also acknowledge that having to listen to pointed criticisms by irate parents in real time while being watched by an audience and having to articulate an on-the-spot justification for stopping speakers that the Chair believes may have violated the Policy would not be an easy task for anybody.

[18] By "ad hoc," I refer to the Chair's invocation of a policy against reading from a book or playing an audio recording. By "unsupported," I refer to the claim that Mr. McBreairty's speech was obscene.

School Board is restricting the speech because the Board disagrees with both Mr. McBrearty's opinions and the unpleasantness that accompanies them.[19]

### c.      The Temporary Ban on Future Attendance

Finally, the School Board's letter and corresponding trespass notices prohibiting Mr. McBrearty from attending any school-related function on RSU 22 property, including School Board meetings, until December 31, 2022, now operate as a categorical ban to exclude all of Mr. McBrearty's speech on school-related topics at School Board meetings and other RSU 22 events. The reason given for this exclusion was the events at the April meeting and "Mr. McBrearty's repeated and deliberate failure to comply with reasonable School Board policies that have been reasonably applied to Mr. McBrearty over the last several months." But as discussed above, close examination reveals that the violations cited are questionable and perhaps overblown. Despite the School Board's assertion that its ban is not based on Mr. McBrearty's expressed viewpoint, the evidence makes me question that.

Regardless, whether the School Board's application of its Policy to Mr. McBrearty is in fact a viewpoint-neutral restriction, the eight-month ban on his attendance at any RSU 22 school-related meeting or function fails the reasonableness requirement. There was only one occasion—at the April meeting—where Mr.

---

[19]      *See Marshall*, 2021 WL 5359020, at *1 (granting preliminary injunction where "the plaintiffs are likely to demonstrate that the challenged [school board] policy provisions violate the First Amendment's prohibition on viewpoint discrimination"); *Anderson v. Hansen*, 489 F. Supp. 3d 836, 842 (E.D. Wis. 2020) (enjoining school district from banning the plaintiff from school property without prior permission because "basic First Amendment principles prevent the District from subjecting the plaintiff to adverse action for no other reason than it considered her speech at the board meeting intolerant, offensive, or hateful").

McBreairty did not comply with the Chair's request to yield his three-minute public comment time and take his seat. The rest of the time, and even at the April meeting, Mr. McBreairty was using the time allowed to speak on school-related subjects, as he is permitted to do under Maine law and the Policy. And in the videos I watched, other than occasionally speaking over or ignoring the Chair's warnings, he does not raise his voice or become disruptive or disorderly. Yet the School Board's response has been to categorically exclude all of his future school-related speech on school grounds for eight months. Singling out one individual, banning his (perhaps disfavored) speech, and essentially preventing him from engaging in a form of civil discourse that is available to everyone else in RSU 22—is unreasonable. *See Cyr v. Addison Rutland Supervisory Union*, 60 F. Supp. 3d 536, 549 (D. Vt. 2014) ("[A] categorical ban on expressive speech singling out an individual does not even satisfy the lower threshold of reasonableness review.").[20]

Critically here, it is the School Board that will bear the burden of justifying its restrictions on speech. At this stage, the decision of which party will ultimately prevail is a close call. And further factual development or the application of a different legal standard (such as the more school-deferential standard set forth in *Bethel*

---

[20]    The School Board argues that Mr. McBreairty has access to other platforms via his "considerable media presence." Opp'n 13. But that does not change the fact that the School Board's ban excludes him from a forum that Maine law designates as the forum in which the School Board hears public comment, and that is the exclusion that is relevant here. It is also significant that the School Board meetings are the one place where School Board members *must* listen to what Mr. McBreairty and other citizens have to say. *See Cyr v. Addison Rutland Supervisory Union*, 60 F. Supp. 3d 536, 549–50 (D. Vt. 2014) (finding that offered alternative to parent banned from attending school board meetings—telephonic participation at the meetings—was inadequate under the First Amendment because it "would have substantially diminished [the plaintiff]'s ability to communicate not only with the school board, but with community members").

*School District No. 403 v. Fraser*, 478 U.S. 675, 684 (1986)) may dramatically change the analysis. But based on the limited briefing and evidence that I have before me, I conclude that the Plaintiff has a fair likelihood of success on his as-applied challenge that the School Board's restrictions violate his First Amendment right to free speech.

### B.   Remaining Claims

The Plaintiff appears to also mount a facial challenge to the Policy and a First Amendment right to petition claim, in addition to his substantive and procedural due process and equal protection claims. Given the need for an immediate ruling and because I find his as-applied free speech claim is likely to succeed on the merits, I will not address Mr. McBreairty's additional arguments and claims at this time.

## II.   Remaining Factors

### A.   Irreparable Harm

"As the Supreme Court has explained, 'the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Fortuno*, 699 F.3d at 10–11 (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)). Because I find that the Plaintiff is likely to succeed on the merits of his First Amendment challenge, some of the work is done. *See id.* at 15 ("Because we conclude that plaintiffs have made a strong showing of likelihood of success on the merits of their First Amendment claim, it follows that the irreparable injury component of the preliminary injunction analysis is satisfied as well."). But the likelihood-of-success-on-the-merits question is a close one here, so whether the Plaintiff has shown that he will suffer an irreparable injury bears additional scrutiny.

The School Board points out that a plaintiff seeking a preliminary injunction must show that "irreparable injury is *likely* in the absence of an injunction." Opp'n 18 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Here, that burden is met because Mr. McBreairty has shown that—absent an injunction against enforcement of the School Board's ban—he has been and will be prevented from attending and speaking at any School Board meeting or other school-related function or meeting on RSU 22 grounds through the end of the year. While Mr. McBreairty may be able to view School Board meetings remotely via the School Board's livestream and is free to try to speak to school officials outside these meetings and off school property, that does not ameliorate the irreparable harm that the ban presents. Therefore, I conclude that the Plaintiff has shown that he is likely to suffer irreparable harm in the absence of immediate relief.

### B. Balance of Harms and Public Interest

The balance-of-harms inquiry also favors the Plaintiff here. I balance the interference with Mr. McBreairty's right to free speech—outlined above—against any harm the School Board will suffer if an injunction is granted. The School Board's claimed harm is that its "significant governmental interest in conducting orderly, efficient meetings" will be harmed by the Plaintiff's attendance at School Board meetings given his proven inability or unwillingness to comply with the Policy. Opp'n 19 (internal quotation marks omitted). This harm is not insignificant, and I appreciate the School Board's interest and the difficulties it has faced in recent months as civil discourse has increasingly become more rancorous throughout our country. But at this stage, without more factual development as to how Mr.

McBreairty's actions disrupt the meetings, at most the School Board will be subjected to this harm for the three minutes that Mr. McBreairty is at the podium. I find that the balance of harms supports the temporary restraining order.

I also must consider the public interest. There is no question that the School Board's interest—conducting the orderly and undisrupted business of the School Board (governing RSU 22's public school system) and providing the opportunity for other members of the public to speak at School Board meetings—is significant. But on the other hand, "[p]rotecting rights to free speech is ipso facto in the interest of the general public." *Cutting v. City of Portland*, No. 2:13-cv-359-GZS, 2014 WL 580155, at *10 (D. Me. Feb. 12, 2014) (internal quotation marks omitted), *aff'd*, 802 F.3d 79 (1st Cir. 2015). And from what I have seen of the limited available evidence, the School Board thus far has not been significantly hampered in its efforts to both run efficient meetings and hear from members of the public, even when Mr. McBreairty is present. Therefore, I find that granting the temporary restraining order is in the public interest.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Plaintiff's motion for a temporary restraining order. The RSU 22 School Board and Defendant Miller (and anyone acting on their behalf) are temporarily restrained from enforcing the May 4, 2022 letter and subsequent criminal trespass notices that prohibit Shawn McBreairty from entering RSU 22 property or attending RSU 22 school-related meetings and

functions. Mr. McBreairty shall be permitted the same access to RSU 22 property and

meetings as other members of the public.


SO ORDERED.

                                        /s/ Nancy Torresen
                                        United States District Judge

Dated this 20th day of July, 2022.